THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                                                                    Mailed:
July 24, 2013                                                                    February 28, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Frito-Lay North America, Inc.*
*v.*
*Princeton Vanguard, LLC*
_____

Opposition No. 91195552
Cancellation No. 92053001
_____

William G. Barber and Paul Madrid of Pirkey Barber PLLC, for Frito-Lay North America, Inc.

David H. Bernstein and Jeremy N. Klatell of Debevoise & Plimpton LLP, for Princeton Vanguard, LLC.
_____

Before Cataldo, Taylor and Ritchie, Administrative Trademark Judges.

Opinion by Ritchie, Administrative
Trademark Judge:

Princeton Vanguard, LLC ("defendant") filed an application to register

"PRETZEL CRISPS,"[1] in standard character format, for "pretzel crackers," in

International Class 30 on the Supplemental Register, disclaiming the exclusive

---

[1] Serial No. 78405596, filed April 21, 2004, based on dates of first use and first use in commerce of October 2004, and issued as Registration No. 2980303 on the Supplemental Register. Section 8 Affidavit accepted.

right to use the term "pretzel" apart from the mark as shown, which registration was granted on July 26, 2005 as Registration No. 2980303 on the Supplemental Register. Defendant later filed an application to register "PRETZEL CRISPS,"[2] in standard character format, for "pretzel crackers," in International Class 30 on the Principal Register, disclaiming the exclusive right to use the term "pretzel" apart from the mark as shown, and claiming acquired distinctiveness in the mark as a whole.

On July 2, 2010, Frito-Lay North America, Inc. ("plaintiff") filed an opposition to the registration of Application Serial No. 76700802 on the ground that when used in connection with "pretzel crackers," the term "PRETZEL CRISPS" is generic and, in the alternative, that "PRETZEL CRISPS" is highly descriptive and has not acquired distinctiveness. On September 10, 2010, Plaintiff also filed a petition to cancel Supplemental Registration No. 2980303 on the same grounds. Defendant denied the salient allegations in both cases. The cases were consolidated.[3] As discussed below, summary judgment motions were filed by each party, and the parties agreed to proceed to trial based on the evidence presented with these motions, as well as supplemental expert declarations. Both parties also filed trial briefs, and plaintiff filed a reply brief.

---

[2] Serial No. 76700802, filed December 11, 2009, based on dates of first use and first use in commerce on October 6, 2004.

[3] The two cases were originally consolidated with another proceeding, Opposition No. 91190246 to Serial No. 77192054, which was the parent case for these proceedings. However, on May 10, 2011, the parties stipulated to voluntarily dismiss that case without prejudice and for defendant to abandon that application. Therefore, the remaining opposition became the parent case.

A hearing was held at the request of defendant, and presided over by this panel, on July 24, 2013.

### The Record and Evidentiary Issues

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of Application Serial No. 76700802 and Registration No. 2980303. As indicated above, the parties stipulated that they could rely on the materials submitted in support of and against each party's motion for summary judgment and that therefore all evidence may be submitted through declarations, including one additional declaration filed by each of the four experts disclosed in the case. (Stip. dated October 9, 2012). The parties agreed to waive any objections to the admissibility of "previously submitted evidence." *Id.*

The parties submitted the evidence listed below.

A.    Plaintiff's testimony and evidence, with attached exhibits.

1.    Declaration of Pam Forbus, plaintiff's Vice-President of Strategic Insights, dated September 8, 2010.

2.    Declaration of Paul Madrid, counsel for plaintiff, dated June 14, 2012;

3.    Declarations of Eric R. Olson, a legal assistant employed by plaintiff's counsel, dated September 8 and December 9, 2010;

4.    Declaration of Katrina Ripperda, a paralegal employed by counsel for plaintiff, dated September 9, 2010;

5.    Declaration of Dr. Ivan Ross, expert employed by plaintiff, dated June 11, 2012;

6. Declarations of Dr. Alex Simonson, expert employed by plaintiff, dated June 13 and October 24, 2012.

B. Defendant's testimony and evidence, with attached exhibits.

1. Declaration of Warren Wilson, defendant's manager and co-founder, and President of Snack Factory, Inc.,[4] dated May 8, 2012;

2. Declaration of Perry Abbenante, Vice-President of Marketing for Snack Factory, Inc., dated May 8, 2012;

3. Declaration of Ryan Scott Mellon, counsel for defendant, dated May 8, 2012;

4. Declaration of Christopher Lauzau, Senior Legal Research Associate employed by defendant's counsel, dated May 8, 2012;

5. Declaration of John O'Donnell, Principal at JP Food Sales, Inc., dated November 1, 2010;

6. Declaration of Gary Plutchok, President of Happy Herman's Food Company, Inc., d/b/a Snacktree International and Jetway Snacks LLC, dated November 1, 2010;

7. Declaration of Salvatore D'Agostino, Business Manager of World Wide Sales, dated November 2, 2010;

8. Declaration of Mark Finocchio, Principal of Pinnacle Food Sales, dated November 1, 2010;

---

[4] Mr. Wilson testified that Snack Factory is an affiliate of defendant's, and was granted an exclusive license to use defendant's marks. (Wilson decl. at para. 4).

9.      Declarations of Dr. George Mantis, expert employed by defendant, dated June 27 and November 2, 2012;

10.     Declarations of Dr. E. Deborah Jay, expert employed by defendant, dated November 18, 2010, and May 2 and November 1, 2012.

Standing

"The facts regarding standing … are part of [a plaintiff's] case and must be affirmatively proved.  Accordingly, [plaintiff] is not entitled to standing solely because of the allegations in its petition." *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).  To prove its standing to oppose the registration of an allegedly generic term, a plaintiff may show it is engaged in the manufacture or sale of the same or related goods as those listed in the defendant's application; that is, that plaintiff has the right to use the term in a descriptive or generic manner.  *Nature's Way v. Nature's Herbs*, 9 USPQ2d 2077, 2080 (TTAB 1989); *Ferro Corp. v. SCM Corp.*, 219 USPQ 346, 352 (TTAB 1983).  *See also Binney & Smith Inc. v. Magic Marker Industries, Inc.*, 222 USPQ 1003, 1010 (TTAB 1984).  Defendant does not contest plaintiff's standing.[5]  Furthermore, inasmuch as the evidence of record shows that plaintiff sells pretzels, crackers, and other snack foods, plaintiff has established its standing.[6]

---

[5] *See* Defendant's response to Plaintiff's Interrogatory No. 12.

[6] Forbus decl. at para. 2.

<u>Genericness</u>

There is a two-part test used to determine whether a designation is generic: (1) what is the genus of goods at issue? and (2) does the relevant public understand the designation primarily to refer to that genus of goods? *H. Marvin Ginn Corp. v. Int'l Assn. of Fire Chiefs, Inc.*, 782 F.2d 987, 990, 228 USPQ 528, 530 (Fed. Cir. 1986). The public's perception is the primary consideration in determining whether a term is generic. *Loglan Inst. Inc. v. Logical Language Group Inc.*, 902 F.2d 1038, 22 USPQ2d 1531, 1533 (Fed. Cir. 1992). Evidence of the public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. *Loglan Inst.*, 22 USPQ2d at 1533; *Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 202 USPQ 100, 105 (CCPA 1979). It is plaintiff's burden to establish that PRETZEL CRISPS is generic by a preponderance of the evidence. *Magic Wand Inc. v. RDB, Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1554 (Fed. Cir. 1991); *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc. dba Watermark Cruises*, 107 USPQ2d, 1750, 1761 (TTAB 2013).

A.    <u>The genus of goods at issue</u>.

There is no dispute that the category of goods here is adequately defined by defendant's identification of goods in the application and subject registration, "pretzel crackers." *See Magic Wand*, 19 USPQ2d at 1552 ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of registration.").

6

B.    The relevant public.

The second part of the genericness test is whether the relevant public understands the designation primarily to refer to that class of goods. The relevant public for a genericness determination is the purchasing or consuming public for the identified goods. *Magic Wand,* 19 USPQ2d at 1553. Because there are no restrictions or limitations to the channels of trade or classes of consumers for pretzel crackers, the relevant consuming public comprises ordinary consumers who purchase and eat pretzel crackers.

C.    Public perception

To determine the public perception of the term "PRETZEL CRISPS" as it applies to "pretzel crackers," we first must decide how to analyze the term. It is well settled that we may analyze the component parts of a proposed mark as a step on the way to an ultimate determination that the proposed mark as a whole is generic. *See 1800Mattress.com IP*, 586 F.3d 1359, 92 USPQ2d 1682, 1684 (explaining that the Board appropriately considered the separate meanings of "mattress" and ".com" when determining that the combination "mattress.com" was generic); *In re Hotels.com LP,* 573 F.3d 1300, 1304, 91 USPQ2d 1532, 1535 (Fed. Cir. 2009) (affirming the Board's finding that "the composite term HOTELS.COM communicates no more than the common meanings of the individual components"). Thus, in cases where the proposed mark is a compound term (in other words a combination of two or more terms in ordinary grammatical construction), genericness may be established with evidence of the meaning of the constituent

words, and where "the terms remain as generic in the compound as individually, and the compound thus created is itself generic." *In re Gould Paper Corp.,* 834 F.2d 1017, 5 USPQ2d 1110, 1112, (Fed. Cir. 1987); *accord In re American Fertility Soc'y*, 188 F.3d 1341, 1347, 51 USPQ2d 1832, 1836 (Fed. Cir. 1999). By contrast, "where the proposed mark is a phrase (such as 'Society for Reproductive Medicine'), the board 'cannot simply cite definitions and generic uses of the constituent terms of a mark'; it must conduct an inquiry into 'the meaning of the disputed phrase as a whole.'" *In re Dial-A-Mattress Operating Corp.,* 240 F.3d 1341, 57 USPQ2d 1807, 1810 (Fed. Cir. 2001), citing *Am. Fertility,* 188 F.3d at 1347, 51 USPQ2d at 1836; *see also In Re Country Music Ass'n, Inc.,* 100 USPQ2d 1824, 1828 (TTAB 2011).

Plaintiff argues that "PRETZEL CRISPS" is a compound term under the *Gould* standard, whereas defendant, citing to *Am. Fertility,* argues that "PRETZEL CRISPS" is a phrase, comprised of terms that "had not previously been used in a unified fashion" and "did not exist in the public lexicon prior to the launch of Snack Factory's PRETZEL CRISPS crackers in 2004." (appl's brief at 44-45). Thus, we must decide whether the term "PRETZEL CRISPS," when applied to "pretzel crackers," is a unified term having a meaning beyond the sum of its parts as argued by defendant, or rather maintains the meaning of its constituent terms as argued by plaintiff.

In analyzing the term, we find no additional meaning added to "PRETZEL CRISPS" in relation to "pretzel crackers," when the individual terms are combined. As noted, compound words that do not add new meaning may be analyzed by their

constituent terms. *See 1800Mattress.com,* 92 USPQ2d at 1684 , *citing Am. Fertility,* 51 USPQ2d 1832 ("[I]f the compound word would plainly have no different meaning from its constituent words, and dictionaries, or other evidentiary sources, establish the meaning of those words to be generic, then the compound word too has been proved generic. No additional proof of the genericness of the compound word is required."). Indeed, the Federal Circuit in *American Fertility* specifically confirmed *Gould*'s applicability to situations dealing with "compound terms formed by the union of words," which is the situation presented in this case. 51 USPQ2d at 1837. We therefore analyze the term as a compound term, using the ordinary grammatical construction.

There is no question that the term "pretzel" in "PRETZEL CRISPS" refers to a type of pretzel, and therefore is generic for pretzels and pretzel snacks, including "pretzel crackers." We therefore discuss the meaning and effect of the term "crisps." Defendant agrees that there are certain foods that may be "crisps" but argues that crackers are not appropriately identified as such. Plaintiff, on the other hand, argues that the term "crisp" has come to be known as one name for a "cracker," and a "pretzel crisp" is therefore a "pretzel cracker." In undertaking our analysis, we keep in mind that while we look to the "primary significance" of the term, what matters is the mark in relation to the identified goods, and we note that all possible generic names for a product must reside in the public domain. *See* J Thomas McCarthy, 2 McCarthy On Trademarks and Unfair Competition § 12:9 (4th ed. 2013). ("Any product may have many generic designations. Any one of those is

9

incapable of trademark significance."); *see also 1800Mattress*, 92 USPQ2d at 1685

("[A]ny term that the relevant public understands to refer to the genus … is

generic.").

    1.    <u>Competitive Use</u>

Plaintiff submitted into the record several instances of use by competitors of

the term "crisps" to name or identify "crackers." These include the following uses on

boxes of crackers:













Defendant has also admitted to referring in nutritional information to its own "pretzel crackers" as "crisps":[7]

> Request for Admission No. 25: Admit that Defendant's packages for its PRETZEL CRISPS products provide nutrition facts for a serving size of a stated number of "crisps."

> Response to Request for Admission No. 25: Subject to the foregoing General Objections, Princeton Vanguard admits this request.

An image was included in the record[8]:

---

[7] Defendant asserted that it has discontinued this use on its packaging.

[8] Although the image was included as an exhibit on the confidential record (Ex. 15 to Madrid decl.), there is no question but that it has been featured on boxes offered to the public. As such, it was misdesignated. Parties should only designate truly confidential information as such.



2.   Use by Media

Plaintiff further submitted evidence of third party or media references

naming or identifying "crackers" as "crisps," including the following:

> Kashi: TLC Pita Crisps: We bake everything we love into our new tasty
> little crackers.   Real food ingredients – like seven whole grains,
> cracked wheat berries, veggies, and natural sea salt – go into each and
> every crisp.
> *http://www.kashi.com.*

17

Raisin Rosemary Crisps: Ooh, these are interesting crackers! And by interesting, we mean stupendous, terrific and completely delicious. Trader Joe's Raisin Rosemary Crisps combine the most unlikely ingredients to create crackers of unequaled flavor, texture and plate presence.
*www.traderjoes.com*.

Vineyard Collection Focaccia Crisps Tuscan Style Crackers – 8 oz.: May 22, 2012- for those of you who haven't tried these new cracker chips, they are wonderful!
*www.napacabs.com*.

34[degree] Crisps Using a handful of natural ingredients, we carefully bake our wafer-thin crackers until they are subtly toasty and overtly tasty.
*http://www.34-degrees.com/product.php*.

Skinny Crisps: The low carb gluten free cracker!
*http://shop.skinnycrisps.com*.

There are also a couple of examples in the record of defendant's "PRETZEL CRISPS" "pretzel crackers" being referred to as "crisps."

A good snack at one serving: Product: The Snack Factory Inc. Original Pretzel Crisps: These crisps are a variation on the classic twisted pretzel, same basic ingredients, only flattened.
*Thestar.com*.

For instance, The Snack Factory, based in Princeton, N.J., launched a line of Pretzel Crisps under the *Modern Classics line.* Created with the natural foods consumer in mind, these crisps offer only 110 calories per serving and come in Tuscan Three Cheese, Supreme, Cinnamon Toast and Classic varieties.
*www.SnackandBakery.com*.

3.    Registrations Disclaiming "Crisps"

Plaintiff submitted evidence of registrations containing the term "CRISPS" for "crackers" that disclaim the term "CRISPS" to show that the term is generic for

18

those goods. *See* TBMP § 704.03(b)(1)(B) and cases cited therein. These registrations include:[9]

POP-TARTS MINI CRISPS for "crackers;" Registration No. 4050507, disclaiming "mini crisps."

CALIFORNIA CRISPS for "crackers;" Registration No. 2228609, disclaiming "crisps" and claiming acquired distinctiveness under Section 2(f).

CHEEZ-IT CRISPS for "crackers;" Registration No. 3277216, disclaiming "crisps."

RAINCOAST CRISPS for "crackers;" Registration No. 3972819, disclaiming "crisps."[10]

4.     Dictionary Definitions

We take judicial notice of the relevant portions of the dictionary definition for

"crisp":

Crisp: adj. 2a. easily crumbled; brittle (a -- cracker) 2b. desirably firm and crunchy (-- lettuce).
Crisp: n. 1a. something crisp or brittle (burned to a --);
*Merriam-Webster's Collegiate Dictionary* (11th ed. 2004).

Crisp: adj. 1. Firm but easily broken or crumbled; brittle; n. 1. Something crisp or easily crumbled.
*The American Heritage College Dictionary* (4th Ed. 2002).

---

[9] We note that plaintiff also submitted evidence of applications, as well as cancelled and expired registrations, for marks that include the term "crisps," where "crisps" has been disclaimed. The applications are not evidence of anything except that they were filed. TBMP § 704.03(b)(2). Likewise the cancelled and expired registrations are not probative. *See* TBMP § 704.03(b)(1)(A) ("it is not evidence of any presently existing rights").

[10] As discussed *infra,* defendant also made of record several registrations for marks that include the term "crisps" that did not include a disclaimer of the term. We point out that each case must be judged on its own merits and by its own record, *see In re Nett Designs,* 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001), and we will accord the registrations made of record by both parties the appropriate weight.

5.  Requests for Admissions

In light of the dictionary definitions and other evidence of record, the following responses to requests for admission by defendant are relevant to showing that "PRETZEL CRISPS" is generic for "pretzel crackers":

Request for Admission No. 8: Admit that some crackers are crisp.
Response to Request for Admission No. 8: Subject to the foregoing General Objections, Princeton Vanguard admits this request.

Request for Admission No. 10: Admit that crackers are firm but easily crumbled or brittle.
Response to Request for Admission No. 10: Subject to the foregoing General Objections, Princeton Vanguard denies this request, but admits that some crackers are firm but easily crumbled or brittle.

Request for Admission No. 17: Admit that "crisps" is a commonly used term for crackers.
Response to Request for Admission No. 17: Subject to the foregoing General Objections, Princeton Vanguard denies this request, but admits that the term "crisps" may be used to describe certain crackers.

Request for Admission No. 25: Admit that Defendant's packages for its PRETZEL CRISPS products provide nutrition facts for a serving size of a stated number of "crisps."
Response to Request for Admission No. 25: Subject to the foregoing General Objections, Princeton Vanguard admits this request.

Request for Admission No. 26: Admit that packages for Pepperidge Farm Backed Naturals Pretzel Thins provide nutrition facts for a serving size of a stated number of "crisps."
Request for Admission No. 26: Subject to the foregoing General Objections, Princeton Vanguard admits this request.

6.  Expert Surveys

As noted, both parties submitted survey evidence and expert declarations.

Each party proffered the results from a "Teflon" survey conducted to test how consumers perceive the term "PRETZEL CRISPS."[11]   As explained below, the surveys reached differing results on the question of whether the term "PRETZEL CRISPS" is generic, and each party has criticized the survey conducted by its opponent.

Professor McCarthy describes a "Teflon" survey as a mini-course in the generic versus trademark distinction, followed by a mini-test involving at least one brand name and one generic item to see whether the survey participants understand the distinction.  J. Thomas McCarthy, 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:16 (4th ed. 2013).

> In designing a TEFLON-type survey, both the initial
> "mini-test" and the other marks and generic names in the
> list must be carefully constructed and tailored to the facts
> of a particular case.

*Id.  See also Jacob Zimmerman v. National Association of Realtors,* 70 USPQ2d 1425, 1435-36 n.15 (TTAB 2004) (flaws in the design and administration of the survey, including the mini-test, resulted in the survey having limited probative value).

### a.   Simonson survey conducted on behalf of plaintiff.

Dr. Alex Simonson, founder and President of Simonson Assoc., Inc., was retained as an expert by counsel for plaintiff.  He conducted a survey between August 15 and September 3, 2011.  The screening criteria were defined as follows:

---

[11] A "Teflon" survey refers to the format of the survey used in *E. I. du Pont de Nemours & Co. v. Yoshida International, Inc.,* 393 F. Supp. 502, 185 USPQ 597 (E.D.N.Y. 1975) to demonstrate that "Teflon" was not generic.

"purchasers of salty snacks at supermarkets or grocery stores within the past 6 months or likely purchasers of salty snacks at supermarkets or grocery stores within the coming 6 months." (Simonson report at 3)  In a "double-blind" survey, his interviewers conducted interviews, by phone, in the following manner, of 250 survey participants:

1. The interviewer read aloud to survey respondents definitions of "category names" (generic names) and "brand names" and asked if survey participants understood the definition of a common name and a brand name.  Only 2 respondents indicated they did not, and they were removed from the survey.  248 then continued on. (Simonson report at 10).

2. Participants who said they understood the difference between a category name and brand name were then read a list of names individually for food and some unrelated products and asked whether they thought each name was a category name, a brand name, "don't know", or "not sure."  The list, with results, follows:

Results By Name:

| Name | Brand | Category | Don't know/ Not Sure |
|---|---|---|---|
| RITZ BITZ | 82% | 12% | 7% |
| LUCKY CHARMS | 87% | 10% | 3% |
| I-POD | 61% | 28% | 11% |

22

| | | | |
|---|---|---|---|
| AMERICAN AIRLINES | 89% | 9% | 2% |
| TRISCUIT | 80% | 13% | 7% |
| **PRETZEL CRISPS** | **41%** | **41%** | **18%** |
| GINGER ALE | 25% | 72% | 3% |
| AUTOMOBILE | 9% | 91% | 1% |
| POTATO CHIPS | 8% | 90% | 2% |
| NEWSPAPER | 5% | 93% | 2% |
| POPCORN | 6% | 93% | 1% |

Based on these results, Dr. Simonson concluded in his report: "The results indicate that PRETZEL CRISPS is not perceived by a majority of relevant consumers as a brand name." (Simonson report at 11). Defendant's expert, Dr. E. Deborah Jay, was retained to rebut the conclusions of Dr. Simonson. She noted several problems with his methodology including the following: 1) the universe of survey participants was underinclusive, including only those who purchase salty snacks at certain places; 2) there were two options of giving no opinion, both "don't know" and "not sure," which may have confused participants, and caused some to choose one or the other incorrectly; and, perhaps most importantly 3) Dr. Simonson did not conduct a mini-test to ascertain whether survey participants understood the difference between brand and common (or category) names, but rather he simply *asked* whether they did. Indeed, as pointed out by Dr. Jay, only two survey participants indicated they did not, or less than 1%.

We agree with Dr. Jay's criticisms of Dr. Simonson's survey. With respect to Dr. Simonson's failure to administer an initial mini-test, an analogous situation was at issue in the recently decided case of *Sheetz of Delaware, Inc. v. Doctor's Assoc., Inc.,* 108 USPQ2d 1341, 1360 (TTAB 2013). In *Sheetz*, the Board determined that "[a]sking a respondent whether he or she understood the difference is not the same as *testing* whether she or he understood the difference." (emphasis in original).[12] As the Board there noted, we can give "little weight" to a survey where a mini-test was not performed and we do not know whether survey participants actually understood what they were being asked. *Id.* at 1361-1362, *citing Jacob Zimmerman v. National Association of Realtors,* 70 USPQ2d at 1435-36 n.5. We reach this conclusion further on the basis that the two "don't know" and "not sure" answers potentially were confusing to survey participants, and may have lead those who understood the survey question to elect to indicate they did not. Accordingly, for these reasons, we give Dr. Simonson's findings little probative weight.

b.    Jay survey conducted on behalf of defendant.

Dr. E. Deborah Jay, founder and President of Field Research Corp., was retained as an expert by counsel for defendant. She conducted a survey between the 16th and 25th of February, 2010. The screening criteria were defined as adults who had "personally purchased salty snacks for themselves or for someone else in the past three months or think that they would do this in the next three months." (Jay report at 1). Initially 500 adults were screened, but only 222 were found

---

[12] Defendant discussed *Sheetz* in supplemental briefing, to which plaintiff filed a reply.

eligible after meeting the screening criteria in a "double-blind" survey, conducted by phone. As a screening gateway, in the *Teflon* format, respondents were given an explanation of the difference between brand and common names, and then asked both whether BAKED TOSTITOS is a brand or common name, and whether TORTILLA CHIPS is a brand or common name. Only those who answered both correctly proceeded with the survey. Those respondents then were questioned about a number of "brand" or "common" names with the option of "don't know."

Of the 222 respondents who proceeded in the survey, the results were as follows:

| Name | Brand | Common | Don't know/ Haven't Heard |
|---|---|---|---|
| SUN CHIPS | 96% | 3% | <1% |
| CHEESE NIPS | 85% | 13% | 2% |
| **PRETZEL CRISPS** | **55%** | **36%** | **9%** |
| FLAVOR TWISTS | 48% | 34% | 18% |
| GOURMET POPCORN | 25% | 72% | 3% |
| ONION RINGS | 8% | 91% | 1% |
| MACADEMIA NUT | 7% | 92% | <1% |

Based on these results, Dr. Jay concluded in her report: "The survey found that the primary significance of the name 'PRETZEL CRISPS' to past and prospective purchasers of salty snacks is as a brand name and not a common (generic) name. Fifty-five percent of survey respondents thought that 'PRETZEL

CRISPS' was a brand name, whereas 36% thought 'PRETZEL CRISPS' was a common (or generic) name." (Jay report at p. 16).

Dr. Simonson was retained by counsel for plaintiff to rebut the conclusions of Dr. Jay. He noted that less than 65% of the initial group "of qualified respondents" was entered into the survey due to the underinclusive nature of the questions, and that accordingly, the Jay survey is flawed.

7.      References to the Combined Term "pretzel crisps"

Although we may consider separately the meanings and uses of "pretzel" and "crisps" in our analysis of a combined term, plaintiff submitted some generic references to the combined term, as follows:

> Sustainable Reinvention: "Combining experience, strong business intuition and a mission to offer healthier products, Baptista's Bakery creates a unique niche. . . . The past four years have seen substantial bottom and top-line growth, as well as its customer base and breadth of products. "And you ain't seen nothing yet," quipped Mr. Howe. In addition to the twisted snack sticks, the plant's other mainstay products are its pretzel crisps and its newest item, the baked potato crisp." *Baking &Snack.* September 2007.

> There are even alternatives to alternative snacks. Don't want a fried potato chip? Try a baked one. If a baked chip has too many calories, try a pretzel crisp instead. *New Products Magazine.* September 2007.

> Off the Beaten Track, a Plus-Size Show: "After some more chit-chat, Ms. Blonsky headed toward the runway. She took her seat next to the stylist Phillip Bloch and set aside her gift bag. (It featured some beauty products, a bag of pistachios, a shot of wheat grass, a no-calorie sparkling kiwi strawberry beverage and a bag of pretzel crisps, which in a very plus-size fashion, a reporter finished as he wrote this story.) *The Wall Street Journal.* September 16, 2010.

> Time to stock up to chow down: "Walker, of the Rochelle Park ShopRite, said he'd just finished a special order for buffalo-wing-

flavored pretzel crisps, the type of request he expected to keep hearing until game time on Sunday." *The Record.* February 2, 2008.

C&C Unique Gift Baskets: Send this wonderful Holiday gift basket filled with gourmet snacks including Belgian truffle, Golden walnut cookies, sparkling cider, pretzel crisps**,** Tortuga rum cake, French vanilla cocoa, Bellagio gourmet mocha and more! *www.candcgiftbaskets.com.*

Sabra in the News: November 16, 2010, Sabra pairs its most popular hummus flavors with pretzel crisps in single serve throw-in-your-beach-bag packs. *http://sabranews.blogspot.com.*

Discussion

Based on the record evidence properly before us, we find that "PRETZEL CRISPS," as used by defendant, would be understood by the relevant public to refer to "pretzel crackers." The commonly understood meaning of the words "pretzel" and "crisps," demonstrates that purchasers understand that "PRETZEL CRISPS" identifies "pretzel crackers."

Defendant argued that the term cannot be generic because there is no dictionary definition for "PRETZEL CRISPS" and no entries in the encyclopedia. However, that is by no means dispositive. *See In re Gould Paper Corp.,* 834 F.2d 1017, 5 USPQ2d 1110, 1111 (Fed. Cir. 1987) (SCREENWIPE held generic even though there was no dictionary definition of the compound term); *In re Dairimetics, Ltd.,* 169 USPQ 572, 573 (TTAB 1971) (ROSE MILK refused registration on the Supplemental Register even though there was no dictionary definition of ROSE MILK). It also does not matter if defendant was the first user or is the only user of the term PRETZEL CRISPS. The law does not permit "anyone to obtain a complete monopoly on use of a descriptive [or generic] term simply by grabbing it first." *KP*

27

*Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (citation omitted); *see also In re Pennington Seed, Inc.*, 466 F.3d 1053, 80 USPQ2d 1758, 1761-62 (Fed. Cir. 2006) (first user of seed varietal name not entitled to monopoly on the name of the varietal); *In re Bailey Meter Co.*, 102 F.2d 843, 41 USPQ 275, 276 (CCPA 1939) (being "the first and only one to adopt and use the mark sought to be registered does not prove that the mark is not descriptive"); Trademark Manual of Examining Procedure ("TMEP") § 1209.03(c) (Oct. 2013 ed.).

Defendant also argued that the term "crisps" is not synonymous with crackers because there are several registrations containing "CRISPS" where the term was not disclaimed. Of the nine registrations submitted by defendant, however, only one was for "crackers," and the others were for other snack foods or cereals, which are not at issue in this case. As noted above, we weigh the evidence accordingly, and on the balance, do not find the overall evidence of registrations to affect our determination. Defendant also argues regarding competitive use that it has removed references to "crisps" in its nutritional information. While that may be so, that there is evidence in the record of defendant's prior references is instructive and, in any case, the record demonstrates the generic nature of the term "crisps." We accordingly find on this record that the designation "PRETZEL CRISPS" is generic for "pretzel crackers."

In making this determination, while we consider the entirety of the record, including the surveys (which in any event arrive at different conclusions), we give controlling weight to the dictionary definitions, evidence of use by the public,

including use by the media and by third-parties in the food industry, and evidence of use by defendant itself. *See In re Hotels.com LP,* 573 F.3d 1300, 91 USPQ2d 1532 (Fed. Cir. 2009). We note that in finding the term "PRETZEL CRISPS" as a whole to be generic, we have analyzed it as a combined term, but were we to analyze it as a phrase, on this record, our conclusion would be the same, as the words strung together as a unified phrase also create a meaning that we find to be understood by the relevant public as generic for "pretzel crackers." *See In re W.B. Coleman Co.,* 93 USPQ2d 2019, 2025 (TTAB 2010) (analyzing proposed mark under *Gould* standard, but finding result would be same under *American Fertility*).[13]

**Decision**: The petition for cancellation of Registration No. 2980303 is granted on the ground that "PRETZEL CRISPS" used in connection with "pretzel crackers," is generic.

The opposition to Application No. 76700802 is sustained on the ground that "PRETZEL CRISPS" used in connection with "pretzel crackers," is generic.

---

[13] In light of our finding of genericness, we have not proceeded with an analysis of whether the term "PRETZEL CRISPS," when used in connection with "pretzel crackers," has acquired distinctiveness.